**UNITED STATES of America,**

v.

**Mukund N. MEHTA, Defendant.**

**No. CRIM.01–10180–NG.**

United States District Court,
D. Massachusetts.

March 3, 2004.

Michael J. Pineault, United States Attorney's Office, Boston, MA, for Plaintiff.

R.J. Cinquegrana, Choate, Hall & Stewart, Boston, MA, for Defendant.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

Mukund N. Mehta ("Mehta") pleaded guilty on March 11, 2003, to a multiple count Indictment charging him with tax evasion, in violation of 26 U.S.C. § 7201, and mail/wire fraud, in violation of 18 U.S.C. § 1341 and 1343. The charges relate to a Needham, Massachusetts, photocopy business that Mehta operated under a franchise agreement with Sir Speedy, Inc. ("Sir Speedy"). Since Mehta's criminal history was as low as it could be, a Category I, the sentencing range under the United States Sentencing Guidelines was driven almost entirely by the offense level. Absent departure, Mehta's putative sentence would have been in the range of 18–24 months. The government appropriately emphasized the nature of the offense and its extent, which, with some important exceptions noted below, the defendant did not contest.

What the defendant did emphasize through three days of highly emotional hearings, voluminous exhibits, and the testimony—indeed, tributes—of numbers of people, was the evidence of Mehta's quite extraordinary life since he emigrated from India to the United States as a young man. Based on that showing, defendant moved for a departure under U.S.S.G. § 5H1.11,[1] a departure for "charitable, or public service" and "similar good works," a discouraged departure from the Sentencing Guidelines.[2]

---

1. The defendant moved for a departure on a number of other grounds which I rejected, namely extraordinary acceptance of responsibility, hardship to employees of his company

should he be incarcerated and the combination of all of the factors.

2. U.S.S.G. § 5H1.11 provides:

I concluded that Mehta's case met every single test for this departure: It was not just the *volume* of the testimonials, although the volume was impressive: 118 letters were sent to the Court describing Mehta's record of charitable and community works; letters, in the nature of petitions, were signed by 399 people, neighbors, friends, customers, members of the community; one hundred people filled the courtroom to overflowing at Mehta's sentencing, and returned for each of the three days (which significantly, were not consecutive) no matter what the distances they had to travel.[3]

Rather, it was the *nature* of Mehta's service: Unique service to Mehta's ancient and extremely strict Indian religion ("Jainism"), service that took the form of substantial amounts of time and personal attention (in bringing Jain scholars to Boston, publishing the sacred Jain literature, facilitating the holding of religious services, personally ministering to needy members of the community, etc.), service on which his religious community greatly relied, service to the Indian community in the United States no matter what their religious affiliation, to his birth village in his native country, and to victims of a tragic Indian earthquake, service even to the wider community of the poor in Boston at the Pine Street Inn, and finally, extraordinary efforts to reach out to an African American friend of Mehta's daughter whom he effectively adopted. To the extent his contributions were financial—and that was a small part of the overall picture—those contributions were extraordinary given his modest lifestyle and means.

The government argued that the facts of Mehta's life did not meet the rigorous standards of the Guidelines. If the government is correct, when courts refer to a departure that is "discouraged," what they really means is "prohibited." I can say without equivocation that if Mehta's situation did not meet the standard, no one could. Whatever the standard for a departure under U.S.S.G. § 5H1.11, which I describe below, however much it has been narrowed, it was met in this case.

As I have always done, I address the legal standard for this departure, and then whether the facts justify its application in the instant case. I proceed in this fashion so that I can assure my own adherence to the premises of the Sentencing Reform Act ("SRA") of 1984, 18 U.S.C. § 3553, and the Guidelines.

The question of whether a given departure is appropriate—whether the case at bar is truly "atypical"—is not simply an empirical question. My charge here is not solely to review all of my cases, all of my colleagues' cases, perhaps all of the criminal cases nationwide, and decide which defendant has contributed the most to his community by some abstract, ill-defined calculus. While an empirical analysis is important, and surely helps courts limit the extent of the departure so that the exception (departure from the Guidelines)

---

Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.

3. I describe the courtroom in order to give the reader—including any reviewing court—the kind of data to which the First Circuit referred in *United States v. Diaz–Villafane*, 874 F.2d 43, 49–50 (1st Cir.1989) ("District

courts are in the front lines, sentencing flesh-and-blood defendants... Therefore, appellate review must occur with full awareness of, and respect for, the trier's superior 'feel' for the case.") Unfortunately, I do not believe that my words can do justice to the courtroom scene or the nature of the testimony. Henceforth, I will videotape the proceedings. *See* John Marzulli, *Judge Will Tape All His Sentencings*, New York Daily News, Jan. 30, 2004, at 4.

do not swallow the rule (Guideline adherence), it is not the whole picture.

Rather, departures raise normative questions:[4] What has "good works" got to do with the purposes of punishment embodied in the Sentencing Reform Act? How does it relate to the language and the structure of the Guidelines and the statutes from which they were derived?[5]

I turn first to the nature of Mehta's offense, then the departure analysis, and the sentence computation.

## I. *THE OFFENSE*

The defendant has pled guilty to mail fraud and tax evasion, which are serious offenses. Nevertheless, when looked at as a whole, much of his conduct, although surely not all of it as his guilty plea suggests, bespeaks more chaos and disorganization than a coherent effort to defraud anyone.

In 1984, Mehta opened a copy shop as a Sir Speedy franchise in Needham, Massachusetts, hiring James Pattangall ("Pattangall") to perform accounting services and to prepare his tax returns, for the years 1994, 1995, and 1996. The record was disputed as to how Pattangall did his job—whether he looked at actual receipts, as Mehta suggested, and characterized them inaccurately, or whether he looked at Mehta's accounts of his income, as the government argued.

Under the terms of the franchise agreement, Mehta was required to pay Sir Speedy a royalty fee equal to five percent of the printing center's "gross sales" as well as an advertising fee equal to two percent of the printing center's gross sales. Specifically, the franchise agreement required Mehta to report the printing center's gross sales to Sir Speedy on a weekly basis via a transmittal sheet that Mehta was to mail to the company's corporate offices in California. Along with the transmittal sheet, Mehta was to send two checks: one representing that week's five percent royalty fee and the second representing that week's two percent advertising fee.

Instead of sending in weekly reports, Mehta mailed the transmittal sheets in batches with one to six months' worth of weekly transmittal sheets. Each batch would also have the royalty and advertising checks computed on the basis of the gross sales reported on the transmittal sheets. Mehta was obviously reconstructing the information post hoc, and he obviously did so badly.

---

4. The First Circuit suggested that whether a departure is "justified" by the facts of the case calls for "an evaluative judgment, not a mechanical exercise." *United States v. Thurston*, 358 F.3d 51, 55 (1st Cir.2004). As I have said previously, in an analogous setting: How does a court go about [the task of determining when 'family ties and responsibilities' are so extraordinary as to warrant departure]? The enterprise is in part empirical. How does this human being compare to others the trial court has seen? But it necessarily involves more than simply counting noses. How atypical does he or she have to be—one in a million, five in a million, five percent of all defendants, etc.? This kind of line-drawing involves the exercise of normative judgments: What kind of punishment do human beings facing these situations *deserve* given the purposes of the SRA? Where *ought* the line between typical and atypical be? No bright line rule was announced by the Commission; none can be announced by a court. *United States v. Lacarubba*, 184 F.Supp.2d 89, 93 (D.Mass.2002).

5. I am applying here the approach spelled out by Hofer and Allenbaugh with specific examples, Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am.Crim.L.Rev.19, 74 (2003) (citing approvingly to my use of this approach in *United States v. Leviner*, 31 F.Supp.2d 23 (D.Mass.1998)).

Significantly, instead of hiding the money he was getting from Sir Speedy in some offshore account, or complex business transactions, Mehta simply put them in a bank. Indeed, it was these very bank records that led the IRS to suspect tax evasion.

To Sir Speedy for the calendar years 1994, 1995, and 1996, Mehta under-reported the total gross sales.[6] However, the figures that Mehta provided to the *government* in his tax returns were not only *different* from the figures for Sir Speedy— but *higher*.[7]

In 1997, Sir Speedy notified Mehta that it would audit his books for the years 1994–1996. Mehta then informed the company that he wished to terminate the franchise agreement and in the negotiations that followed Mehta plainly made serious, indeed, criminal, errors in judgment.

He hired Emmett Rushin ("Rushin"), a business consultant to negotiate with Sir Speedy, although Mehta was plainly aware of what was happening. Mehta (and Rushin) provided Sir Speedy with yet a *third* set of figures for the gross sales of 1994, 1995, 1996—different from the initial set, and different from that provided the

IRS. In addition, Mehta submitted false copies of his federal and state income tax returns to substantiate this set of figures.[8]

As part of the buyout, in 1997, Mehta paid $185,275 to Sir Speedy. At the same time, the IRS audited Mehta. Mehta and his wife hired new counsel, a new accountant, and filed revised tax returns, providing a *fourth* set of figures for the gross sales of the Printing Center, the highest yet.[9] In fact, the Mehta's provided amended returns reporting higher income than the government's own bank statements reflected.

In 2000, after having been notified that the government intended to proceed criminally, Mehta paid $686,194.88 in additional federal and state taxes and interest.[10] It cost him the majority of his savings, and more importantly, it was a concession to the government that his income had been under-reported. To be sure, Mehta did not go back to Sir Speedy, as he should have, to inform them that the figures he had given them three years earlier were wrong.[11]

## II. DEPARTURE—ANALYTICAL FRAMEWORK [12]

6. To Sir Speedy, he reported:

| | |
|---|---|
| 1994 | $242,151 |
| 1995 | $266,970 |
| 1996 | $303,395 |

7. To the IRS, he reported:

| | |
|---|---|
| 1994 | $604,690 |
| 1995 | $625,336 |
| 1996 | $790,079 |

8. The third set of figures were:

| | |
|---|---|
| 1994 | $350,774 |
| 1995 | $346,245 |
| 1996 | $429,895 |

9. The fourth set of figures were:

| | |
|---|---|
| 1994 | $ 920,531 |
| 1995 | $ 897,006 |
| 1996 | $1,051,404 |

10. The stipulated tax loss was $285,424. Mehta paid $686,194.88 with his amended return because of interest and state taxes.

11. The government also points to the fact that Mehta tried to defend himself in this case as indicating a lack of character. The suggestion is preposterous. Mehta had fully cooperated with the IRS in addressing his delinquent taxes. But with respect to the serious criminal charges that had been brought against him, he pressed what appeared to be real defenses, defenses which the Constitution permits him to assert. We will have gone a long way to transform our Bill of Rights into something entirely unrecognizable if defending a criminal action, when one's liberty is on the line, affirmatively counts against the defendant at sentencing.

12. Sentencing Guideline Book to be used in evaluating Mehta's sentence is the 1997 Book that was in effect at the time the offenses were committed. This case does not involve

## A. *Departures In General*

Although it is popular to emphasize one goal of the Sentencing Reform Act, uniformity, in fact the drafters endorsed other sentencing goals, notably, proportionality.[13] The Sentencing Guidelines represented a compromise.[14] To promote uniformity, the Guidelines took into account many factors relating to the offense, the offender's criminal history, and to a lesser degree, other offender characteristics. To promote proportionality, the Guidelines gave courts the discretion to depart from the Guideline sentence when additional factors existed that made the case unusual.[15] It was, the

Commission presciently noted, "difficult to prescribe a single set of guidelines that encompass the vast range of human conduct potentially relevant to a sentencing decision." [16] In the fifteen or so years the Guidelines have been in effect, that task has gotten no easier.

Departures, then, *notwithstanding recent press to the contrary*, were not "violations" of the Guidelines. They were part and parcel of its goals and the engine of Guidelines' evolution. Indeed, recognizing that departures would necessarily lead to differences in sentencing between individuals convicted of the same offense, Congress referred to "unwarranted" disparities and not to disparity *per se*.[17] De-

the changes implicated by the so-called Protect Act (Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Pub.L.No. 108–21, 117 Stat. 650 (effective April 30, 2003)).

13. The Sentencing Reform Act refers to "certainty and fairness" in sentencing. 28 U.S.C. § 991(b)(1). Fair sentencing policies must not only avoid "unwarranted disparities" among defendants similarly situated with respect to the offense, but also "maintain[ ] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B). In addition, Congress ordered the Commission to establish policies and practices that met the traditional purposes of sentencing (retribution, deterrence, incapacitation, and rehabilitation) and to "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). Finally, the Guidelines' Introduction notes that there are three objectives, honesty in sentencing, uniformity, and proportionality. *See* U.S.S.G. § 1A.3.

Significantly, none of these provisions have been altered in recent amendments to the Sentencing Reform Act.

14. The first Commission, for example, explicitly described the difficulties of meeting both goals: Too much uniformity would create a system easy to administer but would threaten proportionality in individual cases, while a system that accounted for every conceivable

characteristic would destroy uniformity, not to mention being unworkable. U.S.S.G. § 1A.4(b); 1A.3. *See also* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1, 13 (1988).

15. The legislative history of the Sentencing Reform Act suggests that the Congress intended that judges retain discretion to impose individualized sentences in special cases. The Senate Judiciary Committee instructed judges to examine the characteristics of each specific offender thoughtfully and comprehensively. S.Rep. No. 98–225, at 52 (Aug. 4, 1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3235 (hereinafter "Senate Judiciary Committee Report"). "The purpose of the sentencing guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences." *Id.*

16. U.S.S.G. Ch. 1, Pt. A, 4(b).

17. 18 U.S.C. § 3553(a)(6)(1988), 28 U.S.C. § 991(b)(1)(B). As Professor Freed notes: "Disparity is a surface phenomenon. It raises the question: why are two seemingly similar cases sentenced differently? When the answer is persuasive in terms of the nature and circumstances of the offense, the history and characteristics of the offender, and the purposes of sentencing, the apparent disparity is in fact warranted. When the disparity cannot be satisfactorily accounted for, it is

partures grounded in the atypical facts of the individual case—emphatically, like the case before me—were "warranted."

## B. *"Good Works" Departures*

### 1. *Language of the Guidelines*

While the statute directed the Commission to "assure that the guidelines ... reflect the general inappropriateness" of certain offender characteristics in sentencing, charitable works, were not mentioned. 28 U.S.C. § 994(e). U.S.S.G. § 5H1.11 was added in 1991 (perhaps in response to departures on this ground and the felt need of judges around the country). 56 Fed.Reg. 22,779 (1991). Charitable works, however, were included in the "not ordinarily relevant" list. Nevertheless, its specific mention suggests that the Commission wanted courts to consider departure on this ground at least in exceptional cases.

What kinds of cases did the drafters mean to include under this provision? The Commission does not say. It rarely does. The only way to glean what they must have had in mind is to evaluate the Guidelines, its policy statements, commentary and structure.

The statute directs courts to consider the "nature and circumstances of the offense" as well as the "history and characteristics of the defendant." 18 U.S.C. Section 3553(a)(1). Addressing the former, the Commission adopted a modified "real offense" scheme, a system that considers the actual conduct in which the defendant was engaged regardless of the charges for which he was convicted. U.S.S.G. § 1A1.1(4)(a). At least one commentator suggested an even broader interpretation:

At its most expansive, a real offense model might base punishment decisions

on the following factors: the current conviction and attendant circumstances; nonconviction offenses committed contemporaneously with the conviction offense; nonconviction offenses committed after the conviction offense; prior conviction and nonconviction offenses; *and perhaps a host of biographic components from good works to employment history.*

Elizabeth T. Lear, *Is Conviction Irrelevant?*, 40 UCLA L. REV. 1179, 1193 (1993). (Emphasis supplied.)

While that formulation may be an overstatement, this much is clear: It is not at all uncommon in sentencing to put the crime in the context of the defendant's life. For example, courts *enhance* a sentence because the defendant's background reflects a life of crime and nothing else. *See, e.g.,* U.S.S.G. § 4B1.3 (reliance upon criminal activity for a livelihood), or U.S.S.G. § 5H1.9 (same). With respect to extraordinary good works, the lens is the opposite—looking at the offense in the context of a lifetime of service.

### 2. *Relationship between Good Works Departures and Unwarranted Disparities*

Taking good works into account is entirely consistent with eliminating "unwarranted sentence disparities." 28 U.S.C. 994(f). As Judge Noonan noted in *United States v. Takai,* 941 F.2d 738, 744 (9th Cir.1991) affirming a departure on these grounds, "if Mother Teresa were accused of illegally attempting to buy a green card for one of her sisters, it would be proper for a court to consider her saintly deeds in mitigation of her sentence." To which Judge Weinstein added that he sees few defendants in Brooklyn as saintly as Mother Teresa, but "we do see many human beings whose good deeds and character warrant recognition in sentencing." [18]

unwarranted." Daniel J. Freed, *Federal Sentencing in the Wake of the Guidelines: Unacceptable Limits on the Discretion of Sentencers,* 101 Yale L.J. 1681, 1705 (1992).

18. Jack B. Weinstein, *A Trial Judge's Reflections on Departures from the Federal Sentencing Guidelines,* 5 Fed.Sent.R. 6, *5 (1992).

Happily, the Boston area in this regard is no different from Brooklyn.

### 3. *Disparity Between White Collar and Blue Collar offender*

In *United States v. Thurston*, 358 F.3d 51 (1st Cir.2004), the Court expressed concern that the implementation of the good works departure would offend one of the goals of the "entire guidelines regime," namely, the goal of "minimiz(ing) discrepancies in the treatment of 'white collar' and 'blue collar' crimes." *Id.* at 80.[19] Indeed, the court noted, the Commission was specifically concerned about the leniency of white collar sentencing. Thurston's position as a "prominent corporate executive," Vice President of Damon Laboratories, a nationwide clinical laboratory testing operation, counted against him because he was better situated to make large financial contributions than "someone for whom the expenses of day-to-day life are more pressing." *Id.* at 79.

As the First Circuit typically does, it cited a host of cases in which the departure showing was inadequate, and not one in which the case was legitimately made. It may be enough for appellate courts to say over and over again, "No, this case is not it, nor that, nor that."[20] As a trial judge with a human being before me, I have to do more.

The Court cannot be saying that *no* white collar offender can *ever* satisfy the strictures of this departure. Nor can it be saying that this departure is prohibited for any offender, no matter what the color of his collar. If it were taking either position the Court would be amending the Guidelines. While the Court's language is broad, it obviously cannot go this far.

---

**19.** To be sure, the parties did not have the benefit of the revised *Thurston* decision at the time of sentencing. I typically explain my findings orally at sentencing, but follow them up with a more full statement of my reasons.

In order to make sure that the parties' appellate rights are not compromised, I will not sign the judgment in this case until five days after the decision has been issued. If either party believes that the reference to the *Thurston* reasoning requires re-argument of any issue, they may file an appropriate and timely motion under the Rules before this Court.

**20.** In an analogous area, defining what "extraordinary rehabilitation" means, I noted:

Perhaps because of the difficulty of the task, the [First Circuit] has mainly defined extraordinary rehabilitation by noting what it *is not* .... [C]ase after case announces: No, that's not it, nor that, nor that...

To be sure, it may be inevitable that appellate courts approach Guideline interpretation this way—defining when the standard is not met. After all, the First Circuit sees only a small percentage of the cases that the district court reviews. The First Circuit reviews only those cases in which a district court has decided to depart, a fraction of the total number of cases, and then only those that the government chooses to appeal, a smaller number still. Moreover, the sampling of cases that the Court of Appeals receives are typically those that district courts have deemed "extraordinary." As a result, the First Circuit is not in a position to see the true "heartland" of cases that come through the courts. An individual case that stands out from the class of cases before a district court might seem humdrum when compared to the more limited and exclusive corpus of "extraordinary" cases that are actually appealed.

As I am a district court judge, I have to seek greater precision. If this departure is to have any meaning—and I have to assume it does—I have to identify when extraordinary rehabilitation is present. It is obviously not enough to say that wherever the district court places the line between ordinary and extraordinary rehabilitation efforts, it has to make certain that such departures are, as the First Circuit colorfully notes, "hen's teeth rare." ... Nor is it enough to intone these words "extraordinary rehabilitation" over and over again, when what we really mean is: Never.
*United States v. Perella*, 273 F.Supp.2d 162, 165 (D.Mass.2003) (case citations omitted).

Indeed, in raising its concerns about blue collar and white collar offenders, when it referred to those "for whom expenses of day-to-day life are more pressing," than charitable contributions, *Thurston*, 358 F.3d 51, 79, I can only assume that the Court had in mind the kinds of activities that a blue collar worker would engage in to qualify for this departure. Curiously, however, the Court has never affirmed a departure on this ground or on any related ground even for the blue collar worker. For example, when blue collar offenders, lacking both time and resources, devote their time to their families, this Court also shuts the door to consideration of those departures, by applying a standard characterized by the Court as "something akin to irreplaceability" in *Thurston*, 358 F.3d 51, 79 (referring to the First Circuit's holding in *United States v. Pereira*, 272 F.3d 76, 82–83 (1st Cir.2001)).

Lacking affirmative guidance from either the Commission or the Court, I will look to the purposes of the Guidelines, other decisional law and relevant secondary material, and parse the facts in the cases in which the departure has been rejected.

### a. *More than "Writing Checks"*

Significantly, even after the passage of the Sarbanes–Oxley Act of 2002,[21] which was intended to remedy the supposedly lenient sentencing of white collar offenders, the Department of Justice sought to amend the good works Guideline. *See* October 1, 2002, Justice Department Letter to Sentencing Commission Concerning the Implementation of Sarbanes–Oxley, 15 Fed.Sent.R. 326, (June, 2003). It proposed:

> Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not

[eliminate "ordinarily"] relevant in determining whether a sentence should be outside the applicable guideline range, except where the good works clearly demonstrate a lifelong, *selfless devotion to the public weal at the expense of personal benefit that outweighs the need for full punishment and deterrence of the defendant's crime*. Financial or material donations are not sufficient to make such a demonstration, and a sentence outside the applicable guideline range should never be imposed on the basis of good works that are characteristic of the defendant's socio-economic status (a prohibited ground for departure under § 5H1.10).

(Italics supplied.)

To be sure, the government's proposal suggests the same restrictions that the First Circuit underscored in *Thurston*, 358 F.3d 51, 79. This departure should not be a "get out of jail" card for the affluent offender. *See United States v. McHan*, 920 F.2d 244, 248 (4th Cir.1990). Rather the focus should be on the defendant's activities, understood in the light of his career and resources, particularly those that go beyond the kind of "impersonal writing of checks" that characterized many wealthy individuals. *See United States v. Serafini*, 233 F.3d 758, 776 (3d Cir.2000).

Mehta's acts, his "hands-on" relationship to his community, the wider Boston area, family and friends, in the context of this offense, fits well within these concerns.

### b. *The Nature of the Offense*

The court in *Thurston* was particularly concerned about the scope of Thurston's offense and his position in his company. He was a high official in the company, Vice President and then Senior Vice President of a company with a nationwide market.

---

**21.** Pub.L. No. 107–204, 116 Stat. 745 (2002) (codified in scattered sections of 11 U.S.C., 15 U.S.C., 18 U.S.C., and 28 U.S.C.) [hereinafter Sarbanes–Oxley].

The offense involved nearly three million dollars in Medicare fraud, an important program. The Court noted that "Thurston's executive position at Damon, which gave him the resources to undertake many of his charitable works, also enabled him to perform the crime . . . ," *Thurston,* 358 F.3d 51, 80, facts which undercut his claim for an "exceptional" good works departure.

Mehta was the solo operator of a photocopy business located in Needham, Massachusetts, under franchise with Sir Speedy. The offense did not involve amounts even close to those in *Thurston.* Moreover, as described below, Mehta, notwithstanding the fraud, had very modest resources. His charitable works were extraordinary in the light of his means, by any measure.

### c. *In the Context of His Entire Life*

In addition, other courts have considered not only the defendant's charitable efforts and work history, but have also put the offense in the context of the defendant's entire life. In *United States v. Somerstein,* 20 F.Supp.2d 454, 463 (E.D.N.Y.1998), for example, the Court considered the defendant's good works in the context of her experiences as a child victim of the Holocaust.

Likewise, this Court considered Mehta's background—as a penniless refugee from the Partition of India, whose family and resources were decimated.

### d. *Relationship to the Goals of Sentencing*

Putting the defendant's offense in the context of an otherwise extraordinarily generous life also bears on 18 U.S.C. § 3553(a)(2)'s goals of "deterrence," protecting the public from future crime, and providing the defendant with "correctional treatment in the most effective manner."

An individual, like Mehta, whose entire life reflects charitable purposes, shamed and humiliated before his community, forced to pay substantial restitution and tax penalties, is one who is not likely to re-offend, and put those good works at risk.

### C. *Application to Mehta*

Mehta left India for the United States and sought to bring with him Jainism, the religion of his family. Jainism is an ancient religion with extraordinarily strict rules that made it difficult to survive in the United States. Mehta took it upon himself to nurture the religion and replicate it here, to create the kind of Jain religious community that existed in India. His relationship to that community was surely unique—not just as a financial contributor but as a moving force, as dramatized by the numbers of people who wrote, or testified, or simply attended the sentencing hearing and returned day after day. Many described their loss and the loss to their community should Mehta be imprisoned.

As I noted on the record, in my time on the bench, I have never quite seen this kind of outpouring. On reflection, I can add, without equivocation, that I had never seen such a presentation at a sentencing proceeding.[22]

### 1. *The Context: The Partition of India*

Mehta and his family came to the United States after the bloody Partition of India.

---

**22.** In my oral recitation, I wanted to make certain that the record reflected not simply what I had heard, but also what I had seen. I reported that Mr. Dinesh Dalal testified with tears in his eyes when he spoke of Mehta's contributions to this community, as did Tiffany Griffin, an African American college student and a friend of Mehta's daughter (as described below). Other witnesses, while not overtly emotional, spoke credibly and passionately. Finally, as Mehta spoke during his allocution, members of the audience likewise reacted emotionally—head in hands, weeping.

He was born in Karachi, then part of India, prior to the Partition. His non-Muslim family had a business, started by his grandfather. In the religious fury unleashed by the Partition, his family lost its business; several of Mehta's uncles and aunts were killed. He and his family were forced to flee to Bombay, India.

At age 25 he emigrated to the United States. After completing his education, he returned to India where his marriage to Dhira (Kothari) was arranged by their parents. Following their wedding, the Mehta's returned to the United States, and purchased a modest home in which they have lived ever since.

### 2. *The Jain Religion*

Mehta helped found the Jain Center of Greater Boston (JCGB) with 24 other families. Jainism is an ancient Indian religion, that stresses non-violence, a multiplicity of viewpoints, compassion and forgiveness. Since the rules of Jainism are strict, it is a small group—2.5 million in India, less than 90,000 in North America.

Jain parents, uprooted from their communities in India, wanted to practice their religion, and raise their children within it. Mehta's efforts have been critical to that enterprise. Mehta served as Vice President of the local Jain center from 1990 to 1992, and then President from 1992–94. Under his tutelage, the Jain community grew to 350 to 400 families.

Jain sacred figures are prohibited from traveling by modern means, such as cars or planes. They walk in bare feet, and eat a rare and specialized diet. Mehta sent and paid for scholars to study with the sacred figures, and then come to the United States and teach in his community. He offered them a room in his home and invited sometimes as many as 150 community members to meet with them. (Testimony of Sinjah Shah; Defendant's Sentencing Memorandum [document # 95], Exhibit A–42, 106). He paid for their airfare, but more importantly, he acted as their host, and their facilitator, in this country. His goal, as one letter described, was to "provide [the] community the privilege of understanding our religion and preserve our culture and heritage." He volunteered to translate Jain prayers into Hindi, Gujarati and English. He printed and distributed books to the Jain Centers in Boston and Rochester and to Sunday schools without charge. He created a Jain directory of all members of the community, paying for a considerable amount of it himself, as well as writing the text.[23] He printed the sacred texts for the Jain Center of Greater Detroit, providing the equivalent of the Jain bible to individuals in that community who never had it. (*See* Defendant's Sentencing Memorandum [document # 95], Exhibit A–25; B–1, 2.)

### 3. *For the Wider Indian Community*

He took it upon himself to act as a mentor to a number of first generation Indians in America. He provided personal support to members of his community and beyond, when family members were sick or passed away, helped others to start a

---

23. I heard testimony of the significance of this Directory. Some statements given were that it nurtured "a sense of belonging," "find contacts with common values," "it supports each other when we travel", "useful information like what are the best universities of the country," Mehta edited it himself, spending ten hours per week for five months. He saw to it that they were delivered all over the country.

As one witness noted, "Mukund is a very effective leader" a "tireless individual" "what distinguishes Mukund from other people are his willingness and dedication to help out non profit organizations, by giving the most important give we all have, which is time." (Testimony of Nishit Vora; Dinesh Dalal.)

business, contributed to medications for others who could not afford them, even helped with college tuition [24] or mortgage payments.

And he contributed to the wider non-Jain Indian community—creating the grandparents club, a support organization for elderly parents—no matter what their religious identification—who had moved to this country to live the rest of their lives with their children and their grandchildren, creating tapes of songs for the elderly, translating books into their native language, and then training one of the members of the grandparents club to do the same. (*See* testimony of Anil Rabarr, Defendant's Sentencing Memorandum [document # 95], Exhibit A–10, 11, 77, 108 and 111.)

One witness, clearly overcome with emotion, described Mehta's help when his father was dying of cancer. Mehta would drop by the house almost every evening, even after a long day of work, to spend time with him, to run errands. When his father passed away, Mehta took care of the funeral arrangements and prayer services. Letter after letter described similar stories. (*See,* e.g., Defendant's Sentencing Memorandum [document # 95], Exhibit A–38, 49, 78, 84, 92; B–3, 4.)

### 4. *The 2001 Earthquake in Bhuj*

After the 2001 earthquake in Bhuj on January 26, 2001, some 30,000 people died. The next day, Mehta went to work, starting a collection for the survivors, traveling to the homes of contributors, picking up and sorting the supplies until his garage was overflowing (and he had to remove his car), and then shipping them. (Testimony of Sunjay Shaw; Defendant's Sentencing Memorandum [document # 95], Exhibit C–6.) [25]

### 5. *Contribution to His Native Country*

Mehta regularly traveled to India and volunteered in its hospitals and for societies that care for children and the elderly. In addition, he has donated money to numerous hospitals in India, participated in a clothing drive, made contributions for an x-ray unit, and contributed to a water purification unit. (*See* Defendant's Sentencing Memorandum [document # 95], Exhibit C–1, 2, 3, 8.)

### 6. *Other Contributions*

Mehta's work went even beyond that for his religious community or his native country. He organized Jain members to volunteer at the Pine Street Inn and other organizations to cook meals and serve them to homeless people. *See* Defendant's Sentencing Memorandum [document # 95], Exhibit A–89. On other occasions he helped complete strangers, sending money to a woman in New York who could not pay for prescription drugs (Defendant's Sentencing Memorandum [document # 95], Exhibit A–22), or helping another get a job (Defendant's Sentencing Memorandum [document # 95], Exhibit A–36).[26]

### 7. *A Special Case: Tiffany Griffin*

I heard particularly moving testimony from a college friend of Mehta's daughter. Tiffany Griffin described her difficulty as an African American student in a predominantly white college, Boston College.

---

**24.** Mehta worked with other young people sponsoring one for citizenship, paying tuition for his nephew and his sister. (*See* Defendant's Sentencing Memorandum [document # 95], Tab C.)

**25.** Significantly, these contributions were made after Mehta was obliged to pay substantial amounts to the IRS.

**26.** Even customers wrote and testified on his behalf. *See* testimony of James Noonan.

Coming from Springfield, Massachusetts, she knew little about the school she was to attend. She had an extremely hard time adjusting, and believed she had nowhere to turn. She was the first person in her family to go to college. Her mother, a single parent, had difficulty understanding what she was going through. Ms. Griffin met Mehta, through his daughter, Jill. The Mehta family, the defendant in particular, essentially adopted her. He told her "my family will become your family" and it did. She stayed for dinner, over the weekends, did laundry at their home. They gave her food to take back to Boston College and let her store her things so she could avoid paying for storage, etc.

Moved to tears on the stand, Ms. Griffin reported that she and Mehta had a special connection, that she "made it through because of Mr. Mehta." She believed that he was able to relate to her because he had been poor too, coming to this country with $16 in his pocket. He accepted her in a way she could accept, not with "hand outs," but "respect and love." [27]

### 8. *Impact*

It is worth noting a common theme in the letters and testimony—the impact of Mehta's leaving the community even for a short time. One comment was typical:

> If he was not there, I may be lost.... He is the one person that any time you need help, you can count on him. Irrespective of what kind of problems he

may have, but for the community he's always up front.

### D. *Government's Position*

Citing no cases, the government argued that I was obliged to discount Mehta's activities in connection with promoting and supporting the religious center/temple that he helped to found. "Efforts undertaken to promote a particular religion do not constitute 'charity' within the general meaning of the term," it insisted, because they risk running afoul of the Guideline's prohibition against considering religion under U.S.S.G. § 5H1.10.[28] But of course, the government adds, charitable activities that are supported or sponsored by a church or temple "count." The enterprise of the court then is to critically evaluate each activity to determine its "scope and purpose."

I refused to do anything of the kind. What the government suggests I do—parsing through charitable works to determine what supports a religion and what merely supports a community, its people, its dreams—seems to walk very close to the very line that § 5H1.10 prohibits. For most faiths—and for this one in particular—religion-supporting acts and the community-supporting acts are indistinguishable. To support this minority religion, to enable it to take root in alien soil, required work on a number of levels, from translating the sacred texts, to teaching children, to building a community. I would not discount any of it.[29]

---

27. Ms. Griffin testified that she grew up in a single parent household, without a father, and added, "I didn't have the support of family and laughing was difficult for me ... If you don't grow up with it, and you don't let down and laugh, and you know, say, let's go get ice cream, and all the things I see on t.v....." The Mehta family, and Mr. Mehta in particular, filled that void.

28. § 5H1.10 Race, Sex, National Origin, Creed, Religion, and Socio–Economic Status

(Policy Statement) provides "[t]hese factors are not relevant in the determination of a sentence."

29. In any event, no such line exists in the case law—between religious and other activities—nor should it. *See United States v. Nava–Sotelo*, 232 F.Supp.2d 1269, 1286 (D.N.M. 2002) (court granted a six level departure based on a number of factors, including religious work).

The government focused also on Mehta's financial contributions, in effect, reducing his work to mere monetary contributions, and then suggesting that there was nothing extraordinary about the amounts. Indeed, the government implied that all Mehta was doing was stealing from Sir Speedy so that he could make these contributions. First, as I have noted, most of Mehta's work was not financial. While the government indicated that the letters spoke in general terms, the testimony I heard and the letters I read were extraordinarily concrete—addressing time and work, painting the walls of the temple, driving from house to house to find clothes for the disaster victims and sort them, and on and on, far beyond writing checks.

Second, the government takes figures out of context in suggesting that Mehta was a wealthy man, who was milking Sir Speedy so he could make these contributions. Significantly, Mehta was not only making financial contributions during the years that he was working with Sir Speedy and his business was growing. He continued to do so when he payed Sir Speedy to get out of his agreement with them in 1997 and again in 2000 when he paid $686,194.88 to the IRS. The latter amount is particularly significant: His business had declined substantially. These payments wiped out his savings, yet he continued both the same level of service and work, and the same level of contributions.[30] In any event, the Presentence report, noting his modest home, cars, and effects, reflects at most, a moderate net worth.

In short, Mehta does not fit the paradigm that the First Circuit routinely discounts—the man or woman with the lavish lifestyle, who can well afford to endow the local museum or philharmonic hall. Mehta ran a copy business, and shared his mod-est income, and a considerable amount of his time, with the community around him.

## III. GUIDELINE CALCULATIONS

### A. Calculation Without Departure

*Tax Evasion*

*Base Offense Level:* (Based on a tax loss of $285,424)

*16* (U.S.S.G. § 2T1.1 and 2T4.1.)

*Mail/Wire Fraud*

*Base Offense Level:*

*6* (U.S.S.G. § 2F1.1(a))

*Increase for Loss of More than $200,000 and less than $350,001: 8* (U.S.S.G. § 2F1.1(b)(1)(I))

*Increase for More than minimal planning:*

*2* (U.S.S.G. § 2F1.1 (b)(2)(A))

TOTAL = *16*

*Grouping rules:* The parties have stipulated pursuant to U.S.S.G. § 3D1.2, that the tax and mail fraud counts should not be grouped. Per U.S.S.G. § 3D1.4, the number of units equals 2, and therefore the total offense level is increased by 2.

*18*

*Acceptance of Responsibility:*

Minus *3*

*Final Offense level:* 15.

Guideline range of 18–24 months, and fine range of $4,000–40,000.

### B. Departure and its Extent

Ordinarily, I would have departed to a zone C, a level 12 or 11, and impose a split sentence, including community confinement. *Monahan v. Winn*, 276 F.Supp.2d 196 (D.Mass.2003), *Iacaboni v. United*

---

**30.** *See* chart at Defendant's Sentencing Memorandum [document # 95], Exhibit Tab C for a list of contributions and dates.

*States,* 251 F.Supp.2d 1015 (D.Mass.2003). But such a sentence makes no sense under the circumstances. Community confinement is helpful for those who need structure, who have no jobs or resources. In *United States v. Rodriguez,* 724 F.Supp. 1118 (S.D.N.Y.1989) for example, the Court said that "the imposition of ... jail sentence would serve no end, but ritualistic punishment..." I made a similar finding in the instant case.

Thus, I departed to level 10 and sentenced Mehta to probation, as described below.

### C. *Restitution*

The government sought $320,193 in restitution. The government projected seven years of increased sales, accepting Sir Speedy's projection that Mehta's income would have increased substantially between 1998 and 2004, as it had between 1994 and 1996, discounted to 1997 dollars.

There were several problems with the approach. Had Sir Speedy sued Mehta civilly, it would have been entitled to the benefit of the bargain between the parties. Restitution, however, serves a different function, namely to compensate the victim for actual losses as well as to provide punishment. After 1997, Mehta's business was not as successful as it had been. The economy faltered. While Sir Speedy projected that his income would have gone up by 10%, as they tried to argue in the 1997 negotiations, in fact Mehta's income declined by half.[31] In addition, Mehta argued that several aspects of the government's computations were speculative—the nature of the discount rate, the continuation of a rebate program that suggested

Mehta's payments would have been less, etc. Moreover, if the company had proposed a figure based on these computations in 1997 (the 10% growth rate and 5.6% discount rate), Mehta could well have decided not to proceed with the buyout and continue the franchise agreement. If Sir Speedy wants "benefit of the bargain" compensation, it should sue Mehta civilly, and not use the government as a collection agency.

To take the company's figures would be tantamount to the following: Assuming someone stole a statute that was worth a million dollars at the time of the theft, but only $1.50 by the time of sentencing. The million dollar figure would be part of the offense conduct computation, the intended loss, as it was here. But the owner would only be entitled to the present value of the item.

Sir Speedy is plainly entitled to the back royalties and advertising fees, using the corrected, pre–1997 sales figures of $214,317, (including both royalty and advertising fees). But for future loss, given the vagaries of the market between 1998 and 2004, and given the legal framework, I conclude that the following restitution figure is appropriate: To the $214,317 I will add $240,875 of royalty losses based on projected future income derived from actual sales (from 1998–2004) without a discount rate adjustment. I will subtract the amount Mehta paid to Sir Speedy ($185,-275) which yields restitution of $269,827.45.

This figure seems particularly appropriate for another reason. In addition to restitution, it is likely that Mehta will be obliged to pay further criminal tax penal-

---

**31.** Sir Speedy projected that Mehta's income would have gone up by 10% between 1998 and 2004, based on the growth rate between 1994 and 1997, when Mehta's business was booming. The government is not pressing a 10% growth rate and the 5.6% discount rate.

Instead, the government has agreed to use the 5% growth rate and the 8.5 % discount rate that Mehta urged. I rejected this approach. My restitution figure, as described below, is based on the actual sales figure and no discount rate.

ties, which could be as much as 75% of the unpaid tax for the years in question, as well as interest on the fraud penalty.

## IV. *CONCLUSION*

Mehta was sentenced to three years' probation, six months of which was in home detention with electronic monitoring, restitution of Two Hundred Sixty–Nine Thousand, Eight Hundred Twenty–Seven And 45/100 ($269,827.45) Dollars, and a fine of Twenty–Nine Thousand And 00/100 ($29,000.00) Dollars.

In order to make sure that the parties' appellate rights are not compromised, I will not sign the judgment in this matter until five days after this decision has been issued. If either party believes that the reference to the *Thurston* reasoning requires re-argument of any issue, they may file an appropriate and timely motion under the Rules before this Court.

**SO ORDERED.**